IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHRISTOPHER KNOX, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Case No.   12-cv-624-MJR-SCW |
| | ) |
| MARVIN POWERS, CAMILLE ADAMS, | ) |
| CAROL GEORGE, LAURA QUALLS, | ) |
| RHONNA MEDLIN, JULIE KLEIN, | ) |
| KATHY BUTLER, GRACY HART, | ) |
| DELORES HUMELE, HEATHER | ) |
| MEADE, CLAUDIA LESLIE, MARILYN | ) |
| MELTON, LAKESHA HAMBY, SHELBY | ) |
| DUNN, KRISTY WATSON, and NIGEL | ) |
| VINYARD, | ) |
| | ) |
| Defendants. | ) |

MEMORANDUM AND ORDER

REAGAN, District Judge:

A.   Introduction

Before the Court are two summary judgments filed by Defendants.   Defendant
Nigel Vinyard has filed a summary judgment arguing that he was not deliberately
indifferent to Plaintiff's serious medical needs (Docs. 141 and 142).   Defendants Marvin
Powers, Camille Adams, Carol George, Laura Qualls, Rhonna Medlin, Julie Klein, Kathy
Butler, Gracy Hart, Delores Humelle, Heather Meade, Claudia Leslie, Marilyn Melton,
Lakesha Hamby, Shelby Dunn, and Kristy Watson[1] have also filed a motion for

---

[1] Named Defendants Merily Merton, Lakesha Baker-Camby, and Shelvy Dunn inform the Court that their
proper names are Marilyn Melton, Lakesha Hamby, and Shelby Dunn.

summary judgment (Docs. 134 and 135) arguing that they were not deliberately indifferent to Plaintiff's serious medical needs, as Plaintiff alleges.

### B.    Background

Plaintiff alleges in his Complaint that Dr. Marvin Powers, Nigel Vinyard, and various nurses at Tamms Correctional Center ("Tamms") were deliberately indifferent to his serious medical condition as he self-mutilated by inserting a foreign object in his urethra.   Plaintiff argues that the Defendants did not treat him for this injury.   He further alleges that the Defendants were deliberately indifferent, insofar as they failed to document his medical condition and falsified medical records.   Plaintiff alleges that, as a result, he had swelling in the bladder and groin area, difficulty urinating and urinating blood, and severe pain and suffering.

Plaintiff was housed at Tamms when on November 9, 2010 he reported to a nurse that he had self-mutilated himself by sticking a foreign object in his urethra (Doc 3-2 at 26; Doc. 135-1 at 2).   In his complaint, he Plaintiff notes that he has an underlying mental health condition that causes him to self-mutilate (Doc. 3-2 at 26).   While the nurse did not note any self-mutilating behavior, she notified mental health and noted that Plaintiff would be seen later that day (Doc. 135-1 at 2).    At the time, Plaintiff did not complain of pain and the nurse noted that Plaintiff ambulated to the cell door with a steady gait and showed no signs of distress (*Id*. at 2-3).   Plaintiff was seen again by a nurse at 8:35 a.m. the same date and notified mental health to monitor (*Id*. at 4).   The nurse also noted that Plaintiff should have a urinalysis (*Id*.).   At 2:55 p.m. that same day,

Defendant Powers gave a verbal order that a urinalysis be done (*Id*. at 5; Doc. 135-4 at ¶ 2).   At 4:30 p.m. a urine specimen was collected and sent out for lab (Doc. 135-1 at 5).

The results of the urinalysis were received by the healthcare unit at Tamms at 11:30 a.m. the following day, November 10, 2010 (*Id*. at 6; Doc. 135-4 at ¶ 3).   No blood was present in the sample and only a trace of protein was present, which Powers noted was not indicative of a foreign object in the urethra (*Id*.).   Plaintiff was seen by Defendant Powers on November 12, 2010 (Doc. 135-1 at 7; Doc. 135-4 at ¶ 4).   At that time, Plaintiff informed Powers that he had inserted the ink cartridge of an ink pen into his urethra and that it was deeper in his body than the penis (Doc. 135-1 at 7).   Powers palpitated Plaintiff and was unable to locate a foreign object (*Id*.; Doc. 135-4 at ¶ 4).   Although Plaintiff insisted that there was an ink pen in his urethra, Powers noted in his chart that his claim was not corroborated by Powers' examination of Plaintiff (*Id*.).

On November 19, 2010, Plaintiff was seen again by a nurse.   She noted that a urinalysis dipstick was done and that it was negative for blood or signs of infection (Doc. 135-1 at 8).   She noted that Plaintiff had not complained to security since his last exam but complained to the nurse about the ink pen still being in his urethra (*Id*.).   The nurse scheduled Plaintiff for a follow-up with the doctor.   Plaintiff saw Powers again on November 23, 2010, and again Powers found no sign of an object in his urethra (*Id*.).

On December 13, 2010, Plaintiff again complained to the nurse that he had a foreign object in his urethra and that he had difficulty urinating with blood in his urine.   The nurse took a urine sample, which was not witnessed, and she returned 10-15

minutes later for the specimen (Doc. 135-1 at 9).   The nurse noted that Plaintiff's urine was cranberry colored and that the dip test results showed blood in the urine (*Id.*). Plaintiff was placed in a doctor call line for the following day, December 14, 2010 (*Id.*). Plaintiff saw Defendant Powers the following day and he found no object upon palpation (*Id.* at 10; Doc. 135-4 at ¶ 8).   Powers also noted that Plaintiff was not in distress and noted no tenderness (*Id.*).   Powers found that Plaintiff's alleged condition was not corroborated by the evidence before him and noted that he would monitor Plaintiff (Doc. 135-1 at 10).

Another urine sample was taken on December 30, 2010, which also tested positive for blood (Doc. 135-1 at 11).   The urine collection was also unwitnessed (Doc. 135-4 at ¶ 9).   As before, the Plaintiff was put in the doctor call line (Doc. 135-1 at 11).   Powers again saw Plaintiff on January 3, 2011 and was unable to palpate an object in his urethra (*Id.* at 12).   Powers ordered that another urine sample be collected and that this one be witnessed; Plaintiff had also complained about bleeding gums during this time and a urinalysis cannot distinguish the origin of the blood (Doc. 135-4 at ¶¶ 10, 12; Doc. 135-1 at 14).   Powers found the two tests which tested positive for blood to be unreliable as a result (Doc. 135-4 at ¶ 12).   Plaintiff refused to give another urine sample (Doc. 135-1 at 13; Doc. 135-2 at 4).   Plaintiff did submit to a urine sample on January 26, 2011, and no blood was found in his urine (Doc. 135-1 at 16).   Powers saw Plaintiff again on January 27, 2011, but Plaintiff refused to allow Powers to palpate his genital area and told the doctor he was "straight" or okay (*Id.*; Doc. 135-4 at ¶ 14).

Although Powers saw Plaintiff for unrelated complaints through much of 2011, Plaintiff did not complain again about a foreign object in his urethra until December 1, 2011 (Docs. 135-1 at 17-20; Doc. 135-2 at 1-8).   Plaintiff informed Powers that he had folded the pen into a "v" and entered it into his penis (Doc. 135-2 at 8; Doc. 135-4 at ¶ 15). Powers was unable to locate an object when he palpated Plaintiff (*Id.*).   Powers saw Plaintiff again on January 5, 2012 (Doc. 135-2 at 10).   Plaintiff complained of burning during urination but Powers found no palpable evidence of a pen in Plaintiff's urethra (*Id.*).   Powers took a urine sample (*Id.*).   Powers again saw Plaintiff on January 11, 2012, again about a foreign object in his urethra (*Id.* at p. 11).   Plaintiff claimed the object had been there for two years (*Id.*).   Powers was unable to palpate a foreign object and the January 5, 2012 urinalysis was normal (Doc. 135-4 at ¶. 17).   Powers also noted that Plaintiff was voiding adequately (*Id.*).

Although Plaintiff was seen by health care staff for various other issues he did not present with his complaints about a foreign object in his urethra again until June 6, 2012 (Doc. 135-2 at 12-17).   Powers found no tenderness and did not find any object upon palpation (*Id.* at 17; Doc. 135-4 at ¶. 18).   Powers took a urinalysis (Doc. 135-2 at 17). Plaintiff was last seen by Powers on September 4, 2012, and Powers again was unable to locate an ink pen in Plaintiff's urethra (*Id.* at 20).

Powers testified in his affidavit that it is his medical opinion that there was not a foreign object in Plaintiff's urethra from the time Plaintiff first reported his concerns on November 9, 2010, to the last time Powers saw Plaintiff on September 4, 2012 (Doc. 135-4

at ¶¶ 20-21).   Powers testified that multiple palpations of the relevant area over two years never revealed a foreign object and given Plaintiff's claim that he folded an ink pen cartridge into a "v" and inserted it into his urethra, Powers believes that it would be palpable upon examination (*Id.* at ¶ 20).   Powers testified that his opinion is also supported by the fact that Plaintiff never showed any sign of infection, either urinary tract or other type, and by the fact that Plaintiff went multiple months without complaining about the object (*Id.* at ¶¶ 21, 23).   While Plaintiff now claims he needs an x-ray to identify the object, Powers testified that Plaintiff had eleven x-rays of his genital region in the past and absent some other concrete evidence, beside Plaintiff's own self-reporting that an object was in his urethra, Powers felt that the risks of exposure to additional radiation by another x-ray outweighed any possible benefit (*Id.* at ¶ 25).

Although no party addresses the issue, additional facts regarding Plaintiff's treatment were presented to the Court in response to Plaintiff's two motions for preliminary injunction.   The Court notes that in response to a Report and Recommendation on Plaintiff's motion for preliminary injunction requesting medical treatment, Plaintiff objected to the recommendation indicting that he had been transferred from Tamms to Pontiac Correctional Center, where he alleges he received proper treatment, including an x-ray which revealed that a foreign object was in his urethra (Doc. 71 at 4).   Plaintiff informed the Court that the foreign body was removed by Pontiac Correctional Center medical staff (*Id.*).   Thus, the Report and Recommendation on the preliminary injunction for medical care was deemed moot.

On April 29, 2013, Plaintiff filed a motion for a temporary restraining order (Docs. 76 and 77), arguing that the foreign object from November 9, 2010, was still in his urethra (Doc. 107 at p. 2).   At an evidentiary hearing on Plaintiff's motion, Dr. Andrew Tilden, medical director for Pontiac Correction Center, testified that he found a palpable foreign object in Plaintiff's urethra and ordered an x-ray which revealed a foreign body including a metallic object which resembled the tip of an ink pen (Doc. 107 at p. 4).   The foreign object was removed on January 15, 2013 (three months *prior* to his statement that the object was still there and had been there since November 2010) (*Id*.; Doc. 88 Ex. B; Doc. 87 Ex. B at ¶ 8).   When removed, the ink pen cartridge was clear with no signs of infection (*Id*.; Doc. 87 Ex. B at ¶ 9).   Although Plaintiff believed the object had been in his body since 2010, Tilden testified that he believed the object had been in Plaintiff's body a short time as it was clean and showed no signs of infectious material (Doc. 107 at p. 5).   He also noted no infection or urinary tract issues, which, if present, would indicate that the object had been in Plaintiff's body for a lengthy period of time (*Id*.). Plaintiff argued that Dr. Tilden never removed the object and pointed to an x-ray report from March 22, 2013, after the pen was removed, which indicated that the object appeared "stable since the prior examination" (*Id*.; Doc. 102 Ex. C).

Plaintiff also alleges that Nigel Vinyard was deliberately indifferent to his medical condition.   Defendant Vinyard was the Health Care Unit Administrator at Tamms from August 2009 to January 2013 (Doc. 142-1 at ¶¶ 1-2).   Although she is a registered nurse, her duties are to oversee the Health Care Unit, address inmate grievances, and ensure

medical services provided by Wexford meet contract requirements (*Id.* at ¶ 3).   She did not personally evaluate or treat Plaintiff but did review various letters and grievances from him regarding his medical treatment (*Id.* at ¶¶ 5-6).   In reviewing those grievances, she would check Plaintiff's medical file to make sure he was getting adequate medical care (*Id.* at ¶7).   She even referred Plaintiff to Dr. Powers on several occasions (*Id.* at ¶. 9).   She relied on Dr. Powers' findings and treatment in responding to Plaintiff's grievances and she believed that Powers was provided Plaintiff with adequate treatment (*Id.* at ¶¶ 11-12).   As Health Care Administrator, Vinyard could not overrule treatment decisions of doctors or refer patients to specialists (*Id.* at 13-16).

### C.   <u>Legal Standards</u>

#### 1.   Summary Judgment

Summary Judgment is proper only "if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." ***Dynegy Mktg. & Trade v. Multi Corp.*, 648 F.3d 506, 517 (7th Cir. 2011) (internal quotation marks omitted) (citing FED. R. CIV. P. 56(a)).   *See also Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005).**   The party seeking summary judgment bears the initial burden of demonstrating—based on the pleadings, affidavits, and/or information obtained via discovery—the lack of any genuine issue of material fact.   ***Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).**

After a properly supported motion for summary judgment is made, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)(2)).** A fact is material if it is outcome determinative under applicable law. *Anderson*, **477 U.S. at 248;** *Ballance v. City of Springfield, Ill. Police Dep't,* **424 F.3d 614, 616 (7th Cir. 2005);** *Hottenroth v. Vill. of Slinger*, **388 F.3d 1015, 1027 (7th Cir. 2004).** A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, **477 U.S. at 248.** "A mere scintilla of evidence in support of the nonmovant's petition is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion." *Albiero v. City of Kankakee*, **246 F.3d 927, 931–32 (7th Cir. 2001) (citations and quotations omitted).**

On summary judgment, the Court considers the facts in the light most favorable to the non-movant. *Srail v. Vill. of Lisle*, **588 F.3d 940, 948 (7th Cir. 2009).** The Court adopts reasonable inferences and resolves doubts in the nonmovant's favor. *Id.; Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, **528 F.3d 508, 512 (7th Cir. 2008).** Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals that "alternate inferences can be drawn from the available evidence." *Spiegla v. Hull (Spiegla I)*, **371 F.3d 928, 935 (7th Cir. 2004),** *abrogated on other grounds by Spiegla v. Hull (Spiegla II)*, **481 F.3d at 966 (7th Cir. 2007).** S**ee also** *Anderer v. Jones*, **385 F.3d 1043, 1064 (7th Cir. 2004).**

## 2.  Deliberate Indifference

The Supreme Court has declared that a prison official's "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment."  *Estelle v. Gamble*, **429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).**  "The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose."  *Rodriguez v. Plymouth Ambulance Serv.*, **577 F.3d 816, 828 (7th Cir. 2009) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).**  The deliberate indifference to a prisoner's serious medical needs is thus a violation of the Constitution.  *Estelle*, **429 U.S. at 104.**  To make such a claim, a plaintiff must show:  1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition.  *Johnson v. Snyder*, **444 F.3d 579, 584 (7th Cir. 2006)**.  Accordingly, a deliberate indifference claim must prove both an objective element, that of a serious medical condition, and a subjective element, demonstrating that prison officials acted with a "sufficiently culpable state of mind to support liability under § 1983.  *Roe v. Elyea*, **631 F.3d 843, 857 (7th Cir. 2011) (quoting *Farmer v. Brennan*, 511 US. 825, 834 (1994) (internal quotation marks removed)).**

The Defendants do not dispute that a foreign object lodged in a person's urethra could constitute a serious medical condition, although they note that it would not constitute a serious medical condition unless there was some significant trauma, infection, or a complete blockage of the urethra caused by the object (Doc. 135 at 11-12)

Certainly, though, a foreign object lodged in a person's body, particularly a very vulnerable area of the body as in this case, could cause ill effects on a person and thus constitute a serious medical condition.   Accordingly, the Court will presume that if an object is lodged in Plaintiff's urethra it constitutes a serious medical condition.   The Defendants employed at Tamms, however, argue that Plaintiff did not have a foreign object in his urethra at the time that they treated him, an issue that the Court will discuss with the second prong of the deliberate indifference analysis.

Moving on to the second prong of the deliberate indifference analysis requires that a prisoner show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference.   "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'"   **Estelle, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).**   "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense."   **Duckworth v. Franzen, 780 F.2d 645, 652-53 (7th Cir. 1985).**   Deliberate indifference requires more than negligence or inadvertent behavior.   **Walker v. Benjamin, 293 F.3d 1030, 1037 (7th Cir. 2002).**   He must "show that the defendants knew of a substantial risk of harm to the inmate, and disregarded the risk."   **Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005).**   A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."   **Farmer, 511 U.S. at 837.**   Negligence, gross negligence, or even "recklessness" as that term is

used in tort cases, is not enough.  *Duckworth,* **780 F.2d at 653;** *Shockley v. Jones,* **823 F.2d 1068, 1072 (7th Cir. 1987).**

Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference.  *Greeno,* **414 F.3d at 653.** "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Farmer* **511 U.S. at 842 (1994).**  An inmate does not have to prove that his complaints of pain were "literally ignored," but only that "the defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs."  *Hayes v. Snyder,* **546 F.3d 516, 524 (7th Cir. 2008) (quoting** *Sherrod v. Lingle,* **223 F.3d 605, 611 (7th Cir. 2000)).**

The Seventh Circuit has noted that the standard is "a high hurdle . . . because it requires a 'showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Roasrio v. Brawn,* **670 F.3d 821-22 (7th Cir. 2012) (citing** *Collins v. Seeman,* **462 F.3d 757, 762 (7th Cir. 2006)).**  "Even if the defendant recognizes the substantial risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton v. McCoy,* **593 F.3d 610, 620 (7th Cir. 2010) (quoting** *Farmer,* **511 U.S. at 843).**

D.    **Application**

1.    **Marvin Powers**

Defendant Marvin Powers argues that he is entitled to summary judgment on Plaintiff's claim that he was deliberately indifferent to Plaintiff's medical needs. Plaintiff argues that he inserted the ink cartridge of an ink pen in a "v" shaped fashion into his urethra and that Powers did not treat him for the object, refused to give him an x-ray, and that he falsified the medical records. Powers states that in his medical opinion, based on his observation of Plaintiff and numerous medical exams, that he believed Plaintiff did not have a foreign object in his urethra and thus there was nothing to treat.

Here, the Court finds that Defendant Powers is not entitled to summary judgment on Plaintiff's claims at this time. The Court acknowledges that the record shows that Defendant Powers saw Plaintiff on twenty-seven occasions between November 9, 2010 and September 4, 2012. Eleven of those appointments focused on Plaintiff's complaint that he stuck an ink cartridge in his urethra. Each time Powers saw Plaintiff for this alleged condition, Powers examined Plaintiff, palpitated his genital and groin area, and took urine samples (Doc. 135-1 and 135-2). Powers testified that there was no evidence in any of those examinations to suggest that Plaintiff had a foreign object in his urethra (Doc. 135-4 at ¶¶ 20, 22). Powers never felt a foreign object, never noted any distress or pain from Plaintiff, or noted any signs of infection (*Id*. at ¶¶ 21-22). Urinalysis performed on Plaintiff corroborated Powers physical findings. While two urinalysis

came back with blood in the urine, Powers was suspicious of those two tests as Plaintiff was not witnessed giving the sample and Plaintiff had complained about bloody gums around that same time (*Id*. at ¶ 12).   When Powers asked for a witnessed sample, Plaintiff refused and a subsequent witnessed sample was negative for blood (Doc. 153-1 at 12-15).   Powers medical opinion based on the evidence before him was that Plaintiff did not have an object in his urethra.

Powers' motion, however, neglects to address facts that were presented to the Court at an evidentiary hearing on Plaintiff's motion for preliminary injunction.   At the hearing on August 1, 2013, Plaintiff testified that upon his transfer to Pontiac Correction Center a foreign object had been located in his urethra.   He originally claimed the object had been removed but in later filings and at the hearing on August 1, 2013, he argued the object was not removed.   Dr. Andrew Tilden, medical director for Pontiac Correctional Center also testified about the object.   Dr. Tilden saw Plaintiff on January 9, 2013, complaining about a foreign object in his urethra.   Dr. Tilden conducted a physical exam and located a foreign object and sought an x-ray which revealed a foreign body including a metallic object which resembled the tip of an ink pen (Doc. 107 at 4; Doc. 87 Ex. B at ¶ 7; Doc. 88 Ex. B; Doc. 87 Ex. C).   The foreign object was removed on January 15, 2013 (*Id*.; Doc. 88 Ex. B; Doc. 87 Ex. B at ¶ 8).   Dr. Tilden testified that the object was removed, but that it was clear with no signs of infection (*Id.;* Doc. 87 Ex. B at ¶ 9).   He also testified that he did not believe the object had been in Plaintiff's body since 2010 as the object was clean with no signs of infectious material (*Id.* at p. 5).

While Tilden's testimony seems to suggest that the object was not the one inserted into Plaintiff's urethra on November 9, 2010 (assuming there was one), the fact that an object was located after Plaintiff's transfer to Pontiac and after he continued to complain that he had a foreign body in his urethra is some evidence that Plaintiff indeed may have suffered from a foreign object in his urethra which Powers failed to locate and remove. Thus, there is an issue of fact as to whether Plaintiff indeed had a foreign object in his urethra while he was at Tamms.

However, as to Plaintiff's claims that Powers falsified medical records, Plaintiff's claim fails.  Plaintiff argues that Powers failed to accurately document Plaintiff's "subjective reasons for the visit, the findings of [his] physical examination, [his] assessment, and a treatment plan" (Doc. 166 at 6).   He points to his medical records for support of his conjecture.   But a review of Plaintiff's medical records shows that each time Powers saw Plaintiff, Powers wrote down details about Plaintiff's complaints, Power's physical exam of Plaintiff, and tests that Powers ordered run.   Nothing in the record supports Plaintiff's contention that Powers falsified, or failed to adequately fill out, his medical records.

Accordingly, the Court finds that Powers is entitled to summary judgment on Plaintiff's claims that he falsified records, but the Court must deny Powers' request for summary judgment as to his treatment of Plaintiff and whether he should have ordered an x-ray.   While the evidence before the Court shows that Powers treated Plaintiff on numerous occasions, performed numerous physical palpations and urine analysis, and

was unable to locate a foreign object in Plaintiff's urethra, there is some evidence that upon Plaintiff's transfer to Pontiac a subsequent x-ray revealed a foreign object in Plaintiff's urethra.   While there is substantial medical evidence from the evidentiary hearing on Plaintiff's preliminary injunction motion that the foreign object removed at Pontiac had not been in Plaintiff's body for two years and thus was not the object Plaintiff complained to Defendant Powers about, the magistrate judge in that hearing made factual and credibility findings to determine that the pen found by Tilden was not in Plaintiff's urethra from 2010.   The Court here, however, cannot make such credibility findings.   *Washington v. Haupert*, **481 F.3d 543, 551 (7th Cir. 2007);** *Payne v. Pauley*, **337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for the factfinder.").**   Thus, the Court is left with a question of fact between Powers who testified that Plaintiff did not have a foreign object in his urethra and Plaintiff's testimony that there was an object supported by an x-ray report indicating a foreign object upon his transfer from Tamms.   Accordingly, at this time there are still issues of fact as to whether Plaintiff had a foreign object in his urethra which Powers failed to locate and remove.   Thus, the Court **DENIES** summary judgment as to that claim.

### 2.    Nurses at Tamms Correctional Center

The Court, however, finds that none of the Defendant nurses were deliberately indifferent to Plaintiff's serious medical needs.   Plaintiff argues that the various nurses

who saw him throughout his incarceration at Tamms were deliberately indifferent because they failed to treat him.   He specifically argues that the first nurse that saw him on November 9, 2010, failed to accurately document his medical complains and that she provided medication to Plaintiff which caused him to have an allergic reaction.   None of these claims, however, are borne out in the record.

Instead, the record indicates that Plaintiff was seen on numerous occasions by various nurses and that each documented his concerns.   The RN that Plaintiff first saw on November 9, 2010, noted that she received a sick call from Plaintiff, while passing out medication, that he had inserted a foreign object in his urethra and was having difficulty urinating (Doc. 135 at 2).   She also noted that he had informed her he had self-mutilated again (*Id.*).   She noted that he voiced no complaints of pain and did not ask for medication (*Id.* at 2-3).   She also observed that he was ambulatory and that he had a steady gait and showed no signs of distress (*Id.* at 3).   The RN indicated that she was going to inform mental health and that Plaintiff would be seen again in the afternoon (*Id.* at 2).   And, indeed, the records show that Plaintiff was seen again by another nurse at 8:35 a.m. who also took down his complaints and included specific details about her meeting with Plaintiff and noted her recommendation that Plaintiff have a urinalysis (*Id.* at 4).   Plaintiff was seen by another nurse for said urinalysis on order of Dr. Powers later that day (*Id.* at 5).

Contrary to Plaintiff's arguments, the medical records show that the nurses who saw Plaintiff took detailed notes about their meetings with Plaintiff, noting his

complaints and their observations of his medical condition.   They also referred Plaintiff for further review, took his urine for lab analysis upon Dr. Powers order, and set up appointments for Plaintiff to see Dr. Powers (Doc. 135-1 at 8-9, 11, 13-14, 16).   In fact, the record shows that every time Plaintiff was seen by a nurse for his alleged foreign object, the nurses who saw him either took urine samples or urinalysis, or referred him directly to Dr. Powers, who usually saw Plaintiff within days of his complaints to the nurses (*Id.*). Nothing in the record suggests that the nurses failed to document Plaintiff's complaints or that they falsified the medical records.   The records are detailed and clear.   There is also nothing to suggest that the nurse who saw him on November 9, 2010, failed to document anything, or that she provided him with pain medicine which he was allergic to.   In fact, her notes in the medical chart are extremely detailed and she <u>specifically</u> noted that Plaintiff did not ask for pain medication (Doc. 135-1 at 1-2).   Further, there is evidence that the other nurses did provide Plaintiff with care in monitoring him, conducting urinalysis testing, and referring him to the doctor.   There is simply nothing in the record to support Plaintiff's claims that the nurses were deliberately indifferent. Thus, the Court finds that all of the Tamms nurses are entitled to summary judgment and **GRANTS** the summary judgment motion as to Defendants Camille Adams, Carol George, Laura Qualls, Rhonna Medline, Julie Klein, Kathy Butler, Gracy Hart, Delores Humelle, Heather Meade, Claudia Leslie, Marilyn Melton, Lakesha Hamby, Shelby Dunn, and Kristy Watson.

### 3.   Nigel Vinyard

### a.      Motion to Strike

Defendant Vinyard filed a Motion to Strike Response to Motion for Summary Judgment (Doc. 173).   Defendant Vinyard argues that Plaintiff's responsive brief was untimely as it was due on May 1, 2014, and Plaintiff did not file his response until May 7, 2014.   Plaintiff has filed a response (Doc. 176) arguing that he timely submitted his response on May 1, 2014, but that the prison law library did not file the document until May 7, 2014.   However, as Plaintiff did not date his brief, there is no way of knowing when the brief was actually submitted to the law library for filing.   Plaintiff points to his affidavit attached to his summary judgment motion as proof that Plaintiff timely submitted his response.   The affidavit is dated May 1, 2014 (Doc. 171-2).   Although not clear evidence of when Plaintiff submitted his responsive brief for filing, the Court will assume that Plaintiff submitted his brief on May 1, 2014, and thus deems it timely filed. The Court **DENIES** Defendant's motion to strike (Doc. 173).

### b.      Deliberate Indifference

Vinyard argues that she also is entitled to summary judgment because, as the Health Care Unit Administrator, she did not treat Plaintiff and instead only reviewed his grievances (Doc. 141).   Plaintiff argues that Vinyard is personally involved in his treatment and that he requested treatment from her, which she denied.

The evidence, however, shows that Vinyard was the Health Care Unit Administrator and, although she was a nurse, she was not trained or licensed to diagnose medical conditions or overrule the medical decisions of the doctors (Doc. 142-1

at ¶¶ 1, 3-4, 13-16).   She never evaluated or treated Plaintiff (*Id*. at ¶5).   Instead, Vinyard responded to Plaintiff's letters and grievances by reviewing his medical records and referring Plaintiff to Powers for treatment (*Id*. at ¶¶ 7, 9).   In the responses, Vinyard reviewed the medical records and found that Plaintiff's conditions had been properly assessed by Defendant Powers (Doc. 142-1 at ¶ 11).   As the health care administrator, Defendant Vinyard was allowed to rely on Powers' diagnosis and treatment of Plaintiff. *Johnson v. Snyder*, **444 F.3d 579. 585-86 (7th Cir. 2006),** *overruled on other grounds Hill v. Tangherlini*, **724 F.3d 965, 967 n. 1 (7th Cir. 2013) (health care administrator who reviewed medical records and relied on doctor's diagnosis in responding to inmate's grievance was not deliberately indifferent);** *Hayes v. Snyder*, **546 F.3d 516, 527 (7th Cir. 2008) (no deliberate indifference when grievance officer investigated and referred the complaint to medical staff);** *Greeno v. Daley*, **414 F.3d 645, 655 (7th Cir. 2005) (prison official who reviewed complaints and verified with staff that inmate was receiving treatment was not deliberately indifferent);** *Spruill v. Gillis*, **372 F.3d 218, 236 (7th Cir. 2004) (non-medical official is able to rely on the belief that a prisoner is in capable hands when under the care of medical experts).**   Thus, in doing so, there is no evidence that Defendant Vinyard was deliberately indifferent to Plaintiff's condition.   The evidence shows that she reviewed Plaintiff's grievances and complaints, checked Plaintiff's medical records, and deferred to the medical professional's treatment.   Her reliance on the doctor's treatment decisions is justified and does not constitute deliberate indifference.   *See Johnson*, **444 F.3d at 585-86**.

The Court notes that Plaintiff objects to the various statements Defendant Vinyard made in her affidavit.   Plaintiff argues that Vinyard did not check his medical records because if she had she would have seen that he was not being treated.   He also argues that she could not have believed or relied on Powers' opinions because he did not treat Plaintiff and did not offer any treatment to Plaintiff.   Plaintiff offers no evidence to support these claims besides his own bald assertions.   The medical records clearly indicate that Powers saw Plaintiff on numerous occasions and examined him.   That Plaintiff did not get the treatment he wanted does not mean that Vinyard didn't check the medical records or believed Powers' findings.   As an administrative officer, Vinyard could rely on Powers' medical findings and treatment recommendations and the evidence before the Court suggests that she reviewed the medical records and did indeed rely on Powers' treatment of Plaintiff.   Further, although Plaintiff argues that Vinyard did personally evaluate Plaintiff, he has no evidence to support this.   Plaintiff points to the affidavits of two inmate witnesses, both who testified that they saw Plaintiff complain to Vinyard about his medical condition (Doc. 171-2 at 9, 13).   However, the witness testimony does not indicate that Vinyard saw Plaintiff in anything other than her administrative capacity.   Vinyard acknowledges that as the health care administrator she reviews inmate complaints.   There is no evidence, however, that Vinyard examined Plaintiff as a nurse or treated Plaintiff in any way.

With regard to § 1983 claims, damages can only be recovered where a defendant's personal involvement can be demonstrated; liability cannot be established purely under

*respondeat superior* alone.   ***Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).**   Where a supervisor is involved, the supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see".   ***Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)).**

Plaintiff seeks to make the Defendant Vinyard liable for her alleged deliberate indifference to the Plaintiff's medical situation, but has at no point demonstrated her personal involvement, or at the very least, her awareness of his situation followed by her conscious decision to "facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."   This lack of personal involvement is, on its own, sufficient to merit a summary judgment.   ***Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011).** The Court **GRANTS** summary judgment to Defendant Vinyard (Doc. 141).

### 4.   Injunctive Relief

While neither party raised this issue in their briefings, the Court notes that Plaintiff's claim for injunctive relief is still pending in this case.   In fact, the Court notes that Defendants were directed to add the current medical director of Pontiac Correctional Center to the case in his official capacity for injunctive purposes (Doc. 86). Defendants identified Dr. Andrew Tilden as the medical director (Doc. 87), but Tilden was inadvertently not added to the case as a party by this Court.   Thus, the Court **ADDS** Andrew Tilden to this case in his official capacity as to Plaintiff's claim for injunctive purposes.   Although neither party addressed Plaintiff's claim for injunctive

relief as Plaintiff's Complaint alleges that the pen is still in his urethra, there is some evidence from which a jury could find that the pen is still in Plaintiff's body. Andrew Tilden testified that the pen was removed on January 15, 2013 (Doc. 107 at 4; Doc. 88 Ex. B; Doc. 87 Ex. B at ¶ 8). Plaintiff disputes this claim, testifying that the object was not removed and that a subsequent x-ray report on March 22, 2013, indicated that the object appeared "stable since the prior examination" which suggests that it was the same object viewed in prior x-rays (Doc. 107 at 5; Doc. 102 Ex. C). Tilden testified that this object was a new pen Plaintiff inserted, but there is an issue of fact which remains as to whether the pen was removed from Plaintiff's urethra or whether it remains in his body to this day. Deciding this issue, involves credibility findings and a weighing of the evidence which this Court is not tasked with doing. Plaintiff's claim for injunctive relief remains.

### E.   Conclusion

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** the summary judgment motion (Docs. 134 and 135) filed by Defendant Powers and the various Defendant nurses. The Court **GRANTS** summary judgment as to Defendants Adams, George, Qualls, Medlin, Klein, Butler, Hart, Humelle, Meade, Leslie, Melton, Hamby, Dunn, and Watson on all claims. There is simply no evidence that these Defendants denied him treatment or falsified medical records. Defendants Adams, George, Qualls, Medlin, Klein, Butler, Hart, Humelle, Meade, Leslie, Melton, Hamby, Dunn, and Watson are **DISMISSED with prejudice.**

The Court further **GRANTS** summary judgment for Defendant Powers as to Plaintiff's claim of falsification of medical records, but **DENIES** summary judgment for Defendant Powers as to Plaintiff's claim of deliberate indifference.

The Court also **GRANTS** Defendant Nigel Vinyard's motion for summary judgment (Docs. 141 and 142) as there is no evidence that she denied Plaintiff medical care or was deliberately indifferent in any other way.

Thus, the only claims that remain are:

(1)     Plaintiff's deliberate indifference claim against Defendant Powers for failing to obtain an x-ray and failing to locate and remove the foreign object in Plaintiff's urethra, and

(2)     Plaintiff's claim for injunctive relief to have the foreign object removed from his urethra.   Dr. Andrew Tilden is **ADDED** to the case as a Defendant in his official capacity for purposes of injunctive relief.

**IT IS SO ORDERED**.

**DATED: <u>August 17, 2014</u>**

*/s Michael J. Reagan*
**Michael J. Reagan**
United States District Judge
